IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 12-1150 (JDB) |
| | ) | |
| v. | ) | |
| | ) | |
| WELLS FARGO BANK, NA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CONSENT ORDER

### I. INTRODUCTION

This Consent Order ("Order") resolves the claims in the United States' Complaint that, during and between 2004 and 2009, Wells Fargo Bank, NA ("Wells Fargo") engaged in a pattern or practice of discrimination on the basis of race and national origin in residential mortgage lending in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f, and the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619.

There has been no factual finding or adjudication with respect to any matter alleged by the United States. The parties have entered into the Order to avoid the risks, expense, and burdens of litigation and to resolve voluntarily the claims in the United States' Complaint against Wells Fargo.

### II. BACKGROUND

Wells Fargo was one of the largest single-family mortgage lenders in the United States between 2004 and 2009. Since 2008, Wells Fargo has been the largest residential home

mortgage originator in the United States, and now originates more than one out of every four mortgages in the country.

In 2009, Office of the Comptroller of the Currency ("OCC") examiners initiated a fair lending review of Wells Fargo's home mortgage product placement practices. As a result of that examination, the OCC determined that it had reason to believe that Wells Fargo engaged in a pattern or practice of discrimination on the basis of race or color, in violation of the FHA and ECOA. Specifically, the OCC found that, after controlling for credit factors, there was reason to believe that Wells Fargo placed African-American applicants in the subprime mortgage lending channel in the Washington-Baltimore-Northern Virginia, DC-MD-VA-WV Combined Statistical Area ("Washington CSA") more frequently than similarly-situated white applicants during the period from 2004 to 2008. Following that determination, and pursuant to 15 U.S.C. § 1691e(g), the OCC referred the matter to the Department of Justice on December 14, 2010.

In May 2009, the United States Department of Justice initiated its own FHA and ECOA investigation into Wells Fargo's home mortgage lending business practices regarding home mortgage pricing and product placement, initially in the Washington CSA and subsequently nationwide. In 2010, the United States informed Wells Fargo that a lawsuit had been authorized regarding its residential lending practices in the Washington CSA, and in 2011, the United States informed Wells Fargo that a lawsuit had been authorized regarding its national residential lending practices. The parties have engaged in good faith, arms-length negotiations that produced this Order.

In its Complaint, the United States alleges that between 2004 and 2009, Wells Fargo engaged in a pattern or practice of discrimination on the basis of race and national origin in violation of both the FHA and the ECOA. Specifically, the United States claims that between

2004 and 2007, Wells Fargo's business policies allowed the discretion to place borrowers in nonprime loan products, even where the borrower could have qualified for a prime loan product. In addition, the United States claims that Wells Fargo permitted persons originating Wells Fargo loans to earn higher overall compensation from placing a prime-qualified borrower into a nonprime loan rather than a prime loan. The United States claims that this combination of discretion and financial incentive resulted in African-American and Hispanic borrowers being placed into nonprime products at higher rates than similarly-situated white borrowers. In July 2007, Wells Fargo closed its wholesale nonprime lending division, and in May 2008, stopped originating nonprime loans from its retail division.

In addition, the United States claims that between 2004 and 2009, Wells Fargo's policies gave third party mortgage brokers that submitted loans to Wells Fargo's wholesale channel for origination the discretion to vary the interest rates, fees, and costs paid by borrowers. The United States alleges that these discretionary charges were not related to the borrower's credit risk or objective qualifications, and that the discretion resulted in African-American and Hispanic borrowers who received loans through Wells Fargo's wholesale lending channel paying higher interest rates, fees and costs than similarly-situated white borrowers. In April 2011, amendments to Regulation Z, which implements the Truth In Lending Act, became effective, and that regulation altered the manner in which brokers may receive compensation from their customers and through the lenders that might originate the loans.

### III.   POSITION OF WELLS FARGO

Wells Fargo asserts that throughout the period of time at issue in this proceeding and to the present, it has treated all of its customers fairly and without regard to impermissible factors such as race and national origin. Wells Fargo enters this settlement solely for the purpose of

avoiding contested litigation with the Department of Justice, and to instead devote its resources to providing fair credit services to eligible persons, and to providing important and meaningful assistance to borrowers in certain distressed U.S. real estate markets.

Wells Fargo notes that it has not been advised by the Department of Justice that the Department alleges that any employee of Wells Fargo discriminated intentionally on the basis of race or national origin. During the period in which Wells Fargo originated subprime loans, it implemented industry-leading procedures to identify subprime loan applicants who might be eligible for a prime-rate product. These procedures were applied to all subprime applicants, without regard to race, national origin or any other impermissible factor. Wells Fargo's borrower data proves that its subprime borrowers had significantly weaker credit characteristics than its prime borrowers. Further, Wells Fargo believes that an appropriate analysis of its loan data and loan-file information show no disparate impact in product placement against African-American or Hispanic borrowers.

The United States' loan pricing claim focuses on wholesale loans and arises from the fees that independent mortgage brokers charged their customers. These fees were neither set by nor payable to Wells Fargo.

No lender in the United States originates a larger number of residential mortgage loans to African-American and Hispanic borrowers than Wells Fargo. Wells Fargo not only denies that it discriminated unlawfully, but affirmatively asserts that it has treated all of its customers without regard to race or national origin, and that its business practices have promoted and achieved fairness across all borrower groups.

## IV. REMEDIAL ORDER

1.     Unless otherwise stated herein, the remedial provisions of the Order will be implemented within 60 days of the Effective Date of the Order and will continue throughout its

term. The Effective Date of the Order will be the date on which it is approved and entered by the Court.

### A.    General Nondiscrimination Injunction

2.    Wells Fargo, including all of its officers, employees, agents, assignees, successors in interest, and all those in active concert or participation with any of them, is hereby enjoined from violating the antidiscrimination provisions of the FHA and the ECOA in connection with the origination of residential mortgage loans.

3.    Nothing in this Order will require Wells Fargo to make unsafe or unsound loans or to require loans to be originated or priced based upon the race or national origin of the borrower or prospective borrower.

### B.    Lending Policies and Procedures

4.    Consistent with Regulation Z, 12 C.F.R. § 1026.36(d), Wells Fargo will prohibit, for all loans secured by residential real estate originated in its name, employees and mortgage brokers[1] from receiving, directly or indirectly, overages, yield spread premiums or other compensation in an amount that is based on any of the terms or conditions of a loan secured by residential real estate, including the annual percentage rate charged to the borrower or the amount by which the interest rate varies from the par rate. This prohibition will not limit compensation that is based on the principal amount of a loan, provided the compensation is based on a fixed percentage of the principal; however, such compensation may be subject to a minimum or maximum dollar amount. This prohibition also will not limit Wells Fargo from allowing a borrower to finance, at the option of the borrower, including through principal or rate, any origination fees or costs, so long as such fees or costs do not vary based on the terms of the

---

[1] The term "mortgage broker" in the Order follows the definition contained in 12 C.F.R. § 1026.36(a), and includes both natural persons and organizations.

-5-

loan (other than the amount of the principal) or the borrower's decision about whether to finance such fees or costs.[2]

5.      Wells Fargo will maintain specific standards, substantially similar to those detailed in its the May 2012 "Wells Fargo Home Mortgage Retail Pricing Policy," for the assessment of all origination fees and costs it charges and retains for itself or pays to its employees on loans secured by residential real estate. Specifically, Wells Fargo will continue to maintain its policy originally implemented in April 2011 of limiting pricing discretion above the par rate to 25 basis points, and prohibiting loan officers in its retail channel from sharing in any funds resulting from charging any amount above the par interest rate. Wells Fargo will also maintain its policy of prohibiting subsidies exceeding 50 basis points (subject to the exceptions provided in the May 2012 Retail Pricing Policy), and will implement a new policy requiring employees to document the reason for any subsidy. Before funding any loan, Wells Fargo will ensure it maintains documentation of compliance with the standards established to satisfy this Paragraph.

6.      Wells Fargo will maintain specific standards, substantially similar to those detailed in its June 2012 "Wholesale Lending Pricing Policy" which are designed to avoid substantial variance in the total broker compensation paid to mortgage brokers on loans secured by residential real estate that are originated in Wells Fargo's name and that Wells Fargo underwrites, originates, or funds. For the duration of the Order, Wells Fargo will continue to maintain its policy of limiting total broker compensation to 3.25 % of the loan amount (inclusive of the 25 basis points bonus based on Wells Fargo's Performance Works Tier Adjuster). Wells

---

[2] No term of this Consent Order will be interpreted to prevent Wells Fargo from complying with any federal statutory or regulatory requirement concerning employee or mortgage broker compensation or loan pricing.

Fargo will also maintain its policy that lender-paid compensation to brokers (including payments by Wells Fargo to a broker made out of loan proceeds) is an agreed-upon amount per loan that does not vary by loan and can only be changed on a quarterly basis, and will also maintain its policy that total borrower-paid broker compensation may not exceed the amount that the broker could have received in total lender-paid compensation for the loan. Wells Fargo will ensure that compliance with these standards is a part of any agreement that provides for a mortgage broker to submit loan applications to Wells Fargo. To the extent the standards established to satisfy this Paragraph allow mortgage brokers to exercise discretion in the amount of the total broker compensation, mortgage brokers will provide a written explanation for borrower-paid total broker compensation that exceeds 2.5% of the loan amount. Before funding any loan, Wells Fargo will ensure it maintains documentation of compliance with the standards established to satisfy this Paragraph.

7.      Wells Fargo will require, for all loans secured by residential real estate originated in its name, all employees and mortgage brokers to comply with the requirements established in Paragraphs 4-6. Wells Fargo will also require an appropriate manager or managers, under the supervision of a designated senior official of Wells Fargo, to review compliance with these requirements. Such review will occur no later than 30 days after closing. In the event that Wells Fargo receives or pays compensation in excess of what is permitted by the policies referenced in Paragraphs 4-6, an appropriate refund will be provided to the borrower in the form of a cash payment or credit to the borrower's account. All reviews will be documented, and such documentation will be retained for the term of the Order.

8.      During the duration of the Order, Wells Fargo will continue to maintain a complaint resolution program to address consumer complaints alleging discrimination regarding

pricing of, or improper product placement with respect to, loans secured by residential real estate originated in Wells Fargo's name. Documentation regarding such complaint resolution program, including documentation of individual complaints and resolutions, if any, will be made available to the United States through the semi-annual reports referenced in Paragraph 11. A person will not be deemed ineligible for the complaint resolution program on the basis of having executed a Release, but there is no requirement under the Order that any complaint necessarily be resolved for or against Wells Fargo or that any particular form or amount of relief be provided to any complainant.

### C.   Monitoring Program

9.     Wells Fargo currently employs a comprehensive fair lending monitoring program. Wells Fargo for the duration of the Order will maintain no less than its currently existing level of fair lending auditing and monitoring detailed in Wells Fargo's "Fair and Responsible Lending (FRL) Policy", dated February 28, 2011.

10.     Within 30 days of the Effective Date of the Order, Wells Fargo will have in place a monitoring program designed to ensure compliance with the Order, which may be satisfied in whole or in part by its existing fair lending monitoring program. The program will be designed to monitor, for all loans secured by residential real estate originated in its name, for potential unexplained disparities by a borrower's race or national origin in the price charged for its residential loan products. At a minimum, Wells Fargo will monitor disparities in APRs, overages, subsidies and total broker compensation. The monitoring will include, but not be limited to, an analysis designed to detect significant unexplained disparities in the price charged for residential loan products by race and national origin with respect to all loans secured by residential real estate originated in Wells Fargo's name. Such analysis will be conducted at the national level and at a metropolitan statistical area (MSA) level for MSAs where Wells Fargo

annually originates at least 100 loans, including at least 30 loans to non-Hispanic whites and 30

loans to either African-Americans or Hispanics. This Consent Order does not require any

product placement monitoring or review with regard to Wells Fargo conventional conforming[3],

conventional non conforming (jumbo)[4], home equity loans or lines of credit, affordable housing[5]

or governmental loans. To the extent Wells Fargo begins originating residential mortgage loans

that are not classified as conventional conforming, conventional nonconforming (jumbo), home

equity loans or lines of credit, affordable housing loans or government loans during the term of

this Order, within 30 days of offering any different type of residential mortgage loan

originations, Wells Fargo will submit a proposed product placement monitoring program to the

United States for its review and approval. If within 30 days of its receipt of the proposed product

placement monitoring program the United States does not notify Wells Fargo in writing that it

objects to the same, the proposed product placement monitoring program will be deemed

approved. If the United States does not believe that the proposed product placement monitoring

program is adequate, Wells Fargo and the United States will meet and confer to resolve the

dispute. If the parties are unable to come to a resolution, the United States may ask the Court to

resolve the parties' differences. Wells Fargo represents that it does not originate any residential

---

[3] These loans are mortgages that are not obtained under a government program (such as FHA or VA), and that also satisfy the standard underwriting guidelines and loan amount limits set by the quasi-government agencies, Fannie Mae and Freddie Mac; these loans, therefore, can be sold to either of these two agencies in the secondary market.

[4] These loans are not obtained under a government program and exceed the maximum conforming limits set by Fannie Mae and Freddie Mac. Such loans rely on the fully documented and verified financial capacity of the borrower as the primary means of repayment as well as a full analysis of the creditworthiness of the borrowers.

[5] These loans are state, county and municipal bond and downpayment assistance programs and prime portfolio products designed to serve low to moderate income communities (which currently consists solely of Wells Fargo's Community Development Mortgage Program).

mortgage loans that would require product placement monitoring as of the date of filing of this Consent Order.

11.    Wells Fargo's senior managers will conduct a semi-annual review of the monitoring programs described in this Order. A report on the review will be presented to the appropriate committee of Wells Fargo's Board of Directors for review and oversight not later than 90 days after the end of each semi-annual period.

a.    In the event that any such review discloses statistically significant disparities at the 95% level either nationally or in any MSA, Wells Fargo will attempt to determine the reason(s) for those disparities and will promptly take corrective action to address significant disparities that were caused by a policy or practice of Wells Fargo, and not justified by legitimate business need. Corrective action will include, as warranted, financial remediation for borrowers, modifications to Wells Fargo's pricing policies and/or monitoring programs as appropriate, and education, discipline or termination of employee(s) or mortgage broker relationship(s). Wells Fargo will document all such disparities, determinations, and actions taken and will provide a summary of the quarterly reviews and any documentation and analysis relating thereto to the United States on a semi-annual basis.[6]

---

[6] All material required by the Order to be sent to the United States will be sent by commercial overnight delivery service addressed as follows: Chief, Housing and Civil Enforcement Section, Civil Rights Division, U.S. Department of Justice, 1800 G Street NW, Suite 7002, Washington, DC 20006, Attn: DJ 188-69-27, or by facsimile to 202-514-1116. Wells Fargo may redact portions based on an assertion of attorney-client privilege from any materials required by the Order to be sent to the United States or to be subject to review by the United States, or, upon notice to the United States, it may withhold materials based on an assertion of attorney-client privilege applying to an entire document. If the United States raises any objections to Wells Fargo's claim of privilege, Wells Fargo and the United States will meet and confer to resolve the dispute. If the parties are unable to come to a resolution, the United States may ask this Court to determine whether the claim of privilege is legally correct.

b.    In the event that any such review discloses statistically significant disparities with respect to any particular employee, branch office, or mortgage broker, Wells Fargo will require the employee, branch manager, or mortgage broker to explain the non-discriminatory reason(s) for those disparities.  If there is no reasonable, nonracial explanation for the noted disparities, Wells Fargo will require the employee or branch manager to take prompt corrective action to address the disparities, and Wells Fargo will take prompt appropriate action with respect to mortgage brokers, up to and including termination of the broker relationship.  In the event that Wells Fargo receives or pays compensation in excess of what is permitted by the policies referenced in Paragraphs 4-6, an appropriate refund will be provided to the borrower in the form of a cash payment or credit to the borrower's account.

If the United States raises any objections to Wells Fargo's determinations or remedial actions, Wells Fargo and the United States will meet and confer to consider appropriate steps to address the concerns raised by the United States' review.  If the parties are unable to come to an agreement regarding such objections, any party may bring the dispute to this Court for resolution.

**D.    Borrower Disclosures**

12.    Wells Fargo will post and prominently display in each location where it receives loan applications a notice of nondiscrimination that satisfies the requirements of 24 C.F.R. Part 110.

**E.    Equal Credit Opportunity Training Program**

13.    Wells Fargo currently provides comprehensive fair lending training to management officials and employees. Within 90 days of the Effective Date of the Order, Wells

Fargo will provide access to a copy of the Order and the policies referenced therein to its management officials and employees who participate in taking applications for, originating, or pricing loans secured by residential real estate, including employees who have significant contact with or oversight of mortgage brokers, and employees responsible for conducting compliance monitoring as provided in Section IV.C of this Order. Wells Fargo will provide access to a copy of the Order and the policies referenced therein to each new management official or employee whose responsibilities include those set forth in the preceding sentence within 30 days of beginning his or her employment in that position.

14.     Within 150 days of the Effective Date of the Order, and annually thereafter for the duration of the Order, Wells Fargo will provide equal credit opportunity training to its management officials and employees who participate in taking applications for, originating, or pricing loans secured by residential real estate, including employees who have significant contact with or oversight of mortgage brokers, and to employees responsible for conducting compliance monitoring as provided in Section IV.C of this Order. Wells Fargo will provide equal credit opportunity training to each new management official or employee whose responsibilities include those set forth in the preceding sentence within 90 days of beginning his or her employment in that position.

15.     During the equal credit opportunity training, Wells Fargo will provide to each participant training on the terms of the Order, the policies referenced therein, the requirements of the FHA, the ECOA, and his or her responsibilities under each. The content of the training program required by this Paragraph will be approved in advance by the United States. Any expenses associated with this training program will be borne by Wells Fargo. At the conclusion of the training program, Wells Fargo will require each employee to successfully complete an

assessment which demonstrates that the employee was provided access to a copy of the Order and the policies referenced therein, understands his or her legal responsibility not to discriminate, and has completed the equal credit opportunity training.

16.    Wells Fargo will offer all mortgage brokers who submit applications to Wells Fargo for loans secured by residential real estate the opportunity to undergo fair lending training similar to the training described in Paragraphs 14-15. Wells Fargo will retain for the duration of the Order documentation of any training conducted or requests for training made pursuant to this Paragraph, and make such documentation available to the United States upon request.

**F.    Satisfaction of United States' Claims for Monetary Relief**

17.    Wells Fargo will deposit in an interest-bearing escrow account the total sum of $125 million to compensate for alleged monetary damages aggrieved persons nationwide who obtained a loan through Wells Fargo's wholesale channel may have suffered as a result of the alleged violations of the FHA and the ECOA (the "Settlement Fund"). Title to this account will specify that it is "for the benefit of allegedly aggrieved persons pursuant to Order of the Court in *United States v. Wells Fargo Bank, NA.*" Wells Fargo will provide written verification of the deposit to the United States within 5 days of the Effective Date of the Order. Any interest that accrues will become part of the Settlement Fund and be utilized and disposed of as set forth herein.

18.    The United States has obtained from Wells Fargo information and data it reasonably believes will assist in identifying allegedly aggrieved persons and determining any damages. Such information and data will be used by the United States only for the law enforcement purposes of implementing this Order. The United States will, upon reasonable notice, be allowed access to mortgage loan files and borrower contact information contained in servicing records of Wells Fargo, Wells Fargo's parent, or any entity owned by Wells Fargo's

-13-

parent for loans Wells Fargo originated between 2004 and 2009 to verify the accuracy of the data provided and to otherwise identify persons entitled to the payments from the Settlement Fund.

19.     Within 60 days of Effective Date of the Order, Wells Fargo will enter into a contract retaining a Settlement Administrator ("Administrator"), subject to approval by the United States, to conduct the activities set forth in the following Paragraphs. Wells Fargo will bear all costs and expenses of the Administrator, and Wells Fargo's contract with the Administrator will require that the Administrator comply with the provisions of the Order as applicable to the Administrator.[7]  The Administrator's contract will require the Administrator to work cooperatively with the United States in the conduct of its activities, including reporting regularly to and providing all reasonably requested information to the United States. Wells Fargo will allow the Administrator access to mortgage loan files and borrower contact information contained in servicing records of Wells Fargo, Wells Fargo's parent, or any entity owned by Wells Fargo's parent for loans Wells Fargo originated between 2004 and 2009 for the purposes of accomplishing its duties under the Order. The Administrator's contract will require the Administrator to comply with all confidentiality and privacy restrictions applicable to the party who supplied the information and data to the Administrator.

20.     The United States will identify allegedly aggrieved persons in the wholesale channel with respect to its race and national origin discrimination claims within 45 days of the Effective Date of this Consent Order. The United States will provide a list of such allegedly

---

[7] In the event the United States has reason to believe that the Administrator is not materially complying with the terms of its contract with Wells Fargo, the United States and Wells Fargo will meet and confer for the purpose of mutually agreeing upon a course of action to effect the Administrator's material compliance with its contract with Wells Fargo. In the event that the United States and Wells Fargo are unable to agree upon a course of action to effect the Administrator's material compliance with its contract with Wells Fargo, the parties may present the matter to the Court.

aggrieved persons to Wells Fargo and the Administrator, along with information on each individual last known address.

21.     The Administrator's contract will require the Administrator to make its best efforts, using all reasonable methods, to locate each identified allegedly aggrieved person and obtain such information as the United States reasonably considers necessary from each. The Administrator's contract will require the Administrator to complete this responsibility within a period of 6 months from the date the United States provides the list described in Paragraph 20, subject to an extension of time as provided by Paragraphs 25 and 42. The Administrator's contract will require the Administrator, as part of its operation, to establish cost-free means for allegedly aggrieved persons to contact it, such as email and a toll-free telephone number.

22.     The United States will specify the amount each allegedly aggrieved person identified in the list described in Paragraph 20 and located by the Administrator will receive from the Settlement Fund no later than 60 days after the Administrator's deadline for locating aggrieved persons in Paragraph 21 has passed. The United States will provide the compensation list to the Administrator. This list will direct no less than $8 million to allegedly aggrieved persons who lived in Illinois at the time of origination to resolve Wells Fargo's pending litigation with the State of Illinois, and the Administrator's communications with such borrowers will refer to both the settlement of litigation by the United States and the State of Illinois. The list will also direct no less than $2 million to allegedly aggrieved persons who lived in the City of Philadelphia at the time of loan origination to resolve the issues presented in the investigation that the Pennsylvania Human Relations Commission ("PHRC") sought to conduct against Wells Fargo, and the Administrator's communications with such borrowers will refer to both the settlement of the United States litigation and the settlement of the issues that the PHRC raised.

23.     The Administrator's contract will require the Administrator to send releases, with language approved by the United States and Wells Fargo as set forth in Appendix A, to allegedly aggrieved persons (hereafter, "Releases"). After receipt of executed releases, the Administrator's contract will require the Administrator promptly to deliver payments to those persons in amounts determined by the United States as described in Paragraph 22. The Administrator's identification and payment responsibility may take place on a rolling basis with approval from the United States.

24.     The Administrator's contract will require the Administrator to set forth reasonable deadlines, subject to approval of the United States, so that the compensation is distributed and checks are presented for payment or become void prior to the date that is 24 months from the date the Administrator begins to locate allegedly aggrieved persons pursuant to Paragraph 21.

25.     Payments from the Settlement Fund to allegedly aggrieved persons will be subject to the following conditions, provided that the details in administration of the Settlement Fund set forth in Paragraphs 18-24, can be modified by agreement of the parties and without further Court approval:

(a)     No allegedly aggrieved person will be paid any amount from the Settlement Fund until he or she has executed and delivered to Wells Fargo a Release; and

(b)     The total amount paid by Wells Fargo collectively to the allegedly aggrieved persons will not exceed the amount of the Settlement Fund, including accrued interest.

26.     All money set aside in the Settlement Fund for allegedly aggrieved persons who received nonprime loans from Wells Fargo's wholesale channel but not distributed to such persons, including accrued interest, within 24 months from the date the Administrator begins to locate allegedly aggrieved persons pursuant to Paragraph 21 will be allocated to the borrower

-16-

assistance program described in Section IV.G of this Order provided that there continues to be demand for direct borrower assistance in multiple geographic areas. If the borrower assistance program remains operational and there continues to be demand for direct borrower assistance in multiple geographic areas, then the United States will designate which geographic area should receive the remaining funds. Such decision will be made in consultation with Wells Fargo.

27.   If the borrower assistance program is no longer operational or there is not sufficient demand for additional direct borrower assistance in any geographic area as of 24 months from the date the Administrator begins to locate allegedly aggrieved persons, then any remaining funds will be distributed to qualified organization(s) that provide services including credit and housing counseling (including assistance in obtaining loan modification and preventing foreclosure), legal representation of borrowers seeking to obtain a loan modification or to prevent foreclosure, financial literacy, and other related programs targeted at African-American and Hispanic potential and former homeowners in communities where the Complaint alleges significant discrimination occurred against African-American and Hispanic borrowers. Recipient(s) of such funds must not be related to Wells Fargo, Wells Fargo's parent, or any entity owned by Wells Fargo's parent. Wells Fargo will consult with and obtain the non-objection of the United States in selecting recipient(s) of these funds and the amount to be distributed to each, and the parties will obtain the Court's approval prior to distribution of any remainder of the Settlement Fund's assets. Wells Fargo will require each recipient to submit to Wells Fargo and the United States a detailed report on how funds are utilized within one year after the funds are distributed.

28.   Wells Fargo will not be entitled to a set-off, or any other reduction, of the amount of payments to aggrieved persons because of any debts owed by the identified persons. Wells

Fargo also will not refuse to make a payment based on a release of legal claims or loan modification previously signed by any such aggrieved persons, including but not limited to, any release of claims signed in connection with the settlement reached between the United States and Wells Fargo & Company in February 2012 regarding mortgage loan servicing and foreclosure abuses.

### G.   Borrower Assistance

29.     Within 60 days after the entry of this Consent Order, Wells Fargo will institute a new homebuyer assistance program to be implemented in jurisdictions within the following Metropolitan Statistical Areas ("MSAs") (as defined by 2005 U.S. Census Bureau data): Washington-Arlington-Alexandria, DC-VA-MD-WV; Chicago-Naperville-Joliet, IL-IN-WI; Philadelphia-Camden-Wilmington, PA-NJ-DE-MD; San Francisco-Oakland-Fremont, CA; New York-Northern New Jersey-Long Island, NY-NJ-PA; Cleveland-Elyria-Mentor, OH; and Riverside-San Bernardino-Ontario, CA. Wells Fargo will also implement this new homebuyer assistance program in the City of Baltimore, Maryland. For purposes of this Consent Order, this program is referred to hereinafter as the "Wells Fargo Borrower Assistance Program."

30.     Of all funds expended on the Wells Fargo Borrower Assistance Program, at least $50 million will be directly funded by Wells Fargo Bank, N.A. This amount, which is separate from and in addition to the $125 million that will be set aside pursuant to Paragraph 17 for compensation of allegedly aggrieved persons who received nonprime loans from Wells Fargo's wholesale channel and from any rebates described in Paragraph 37 will be placed directly into an escrow account or accounts (which may be created for each geographic area) within 30 days of the entry of this Consent Order. Within 60 days of the entry of this Consent Order, the Parties will agree to the allocation of this $50 million among the seven MSAs and the City of Baltimore

listed in Paragraph 29 above, and on the selected geographic areas within the MSAs where the Borrower Assistance Program will operate. For purposes of this Consent Order, these grants are referred to herein as the "Borrower Assistance Grants", and may be in any amount up to but not exceeding $15,000. Each Borrower Assistance Grant will be in the form of a 0% interest loan, 20% of which will be forgivable each year for five years. The prorated balance due is repayable if the property is sold, refinanced, or if there is a transfer of title or foreclosure within the first five years, subject to an limited exception for refinancing (with no cash out to the borrower) of the first mortgage to a lower interest rate due to death or divorce where one of the original borrowers remains an owner of the property. Any recaptured funds will be returned to the Borrower Assistance Grant pool of funds and made available for assistance to other qualified borrowers. Each Borrower Assistance Grant must be used for downpayment assistance, closing cost assistance, and/or, subject to the conditions of this paragraph, for home renovation financing. Borrower Assistance Grants may be used for home renovation financing only in connection with the Federal Housing Administration (FHA)'s 203k program and conventional renovation loans, and must be in connection with the purchase of a home. Wells Fargo may modify or define additional terms and requirements for the downpayment assistance as necessary to implement the Wells Fargo Borrower Assistance Program that are consistent with the terms of this Consent Order, subject to approval by the United States.

31.     Wells Fargo may choose to expend additional funds in connection with the Wells Fargo Borrower Assistance Program, such as providing homebuyer education and counseling; however, at least $50 million must be spent directly on downpayment assistance, closing cost assistance, and/or home renovation financing in connection with the purchase of a home. Any homebuyer education or counseling must be conducted by a HUD-approved counseling agency.

Wells Fargo may define additional procedures and requirements for homebuyer education and counseling, subject to approval by the United States.

32.     The Borrower Assistance Grants may be administered by an independent third-party nonprofit agency selected by Wells Fargo, subject to approval by the United States. This independent third-party nonprofit agency may work with local nonprofit agencies in each of the MSAs or cities. Borrower Assistance Grants will be made to applicants earning less than 120% of Area Median Income (as defined by 2012 Department of Housing and Urban Development guidelines). It is not necessary that individuals receiving Borrower Assistance Grants be first-time homeowners, although the grants must be used for a primary owner-occupied residence of 1-4 units in the areas designated by the parties, and may not include manufactured housing. If the borrower currently owns a home, it must be sold prior to closing on the property purchased using a Borrower Assistance Grant.

33.     Wells Fargo may not require that properties purchased with the help of Borrower Assistance Grants be financed by Wells Fargo Bank, NA or any affiliated lender; however, Wells Fargo Bank, N.A., is not prohibited from financing properties purchased with the help of Borrower Assistance Grants. With respect to the first mortgage, Fannie Mae, Freddie Mac, FHA, VA, conventional renovation, conventional portfolio products, and other CRA affordable lending program guidelines will apply. For Conventional Portfolio products or other CRA affordable lending programs, a reasonable combined loan-to-value ratio will be set by Wells Fargo. The total of all financing cannot result in cash back to the borrower.

34.     If the borrower has liquid reserves (cash or funds in accounts readily able to be converted to cash funds without penalty) greater than 6 months of principal, interest, taxes and

insurance, or $7,500, whichever is lower, such excess funds will be required to go toward a down payment or closing costs before any Borrower Assistance Grants are applied.

35.     Wells Fargo will provide targeted marketing regarding Borrower Assistance Grants in communities including census tracts that are greater than 40% African-American (as identified using data from the 2010 Census) or Hispanic, and in communities including census tracts with average income levels of at or below 120% of Area Median Income.  Borrower Assistance Grants may be made to individuals of any race or nationality provided the borrower meets the income requirements set forth above.  Wells Fargo will engage in targeted marketing which will include an event in each designated MSA, information to individuals interested in receiving Borrower Assistance Grants, and media announcements in outlets serving the communities in the designated census tracts.  At least one such event must take place in each designated MSA within one year of the Effective Date of this Consent Order.

36.     All Borrower Assistance Grants must be distributed within two years of the date of entry of this Consent Order.  Any funds recaptured pursuant to Paragraph 30 must be re-distributed within one year of recapture.  Any funds allocated to the borrower assistance program from the Settlement Fund pursuant to Paragraph 26 will be redistributed within one year from the time such funds are allocated to the borrower assistance program.  In the event there is not sufficient demand for the Wells Fargo Borrower Assistance Program and there are remaining funds, the provisions of Paragraph 27 setting out procedures for distribution to qualified organizations will apply to such remaining funds.

**H.     Internal Review Process Regarding Nonprime Loans from Wells Fargo's Retail Division**

37.     In addition to compensating allegedly aggrieved persons who received Wells Fargo loans from independent mortgage brokers, Wells Fargo agrees to undertake an internal

review, using an agreed upon statistical model and process, to determine whether there exist African-American and/or Hispanic borrowers who received nonprime Wells Fargo loans from Wells Fargo's retail channel who, based on the results of the statistical model, arguably might have qualified for prime loans from Wells Fargo's retail channel. Wells Fargo will provide a list of any such borrowers identified by the model to the United States no later than 45 days after the Effective Date of this Consent Order. Wells Fargo will provide cash rebates to such borrowers in an amount commensurate with the amounts paid to borrowers who received nonprime Wells Fargo loans from Wells Fargo's wholesale division. Wells Fargo may not use funds from the Settlement Fund or the Borrower Assistance Program to pay for the rebates. To be eligible for the rebate, the borrower must execute and deliver to Wells Fargo a Release similar in form to that contained in Exhibit A. The rules and procedures governing the rebates will be the same as set forth in Paragraphs 18-24, 26-28, and 36, above.

## V. EVALUATING AND MONITORING COMPLIANCE

38.     For the duration of the Order, Wells Fargo will retain all records relating to its obligations hereunder as well as its compliance activities as set forth herein. The United States will have the right to review and copy such records upon request, including loan files and electronic data for loans secured by residential real estate made during the duration of the Order.

39.     Wells Fargo will provide to the United States the data on its lending that is submitted to the Federal Financial Institutions Examination Council (FFIEC) pursuant to the Home Mortgage Disclosure Act and the Community Reinvestment Act. The data will be provided in the same format in which it is presented to the FFIEC, within 30 days of its submission to the FFIEC each year, for the duration of the Order, including the record layout.

40.    In addition to the submission of any other plans or reports specified in the Order, Wells Fargo will submit semi-annual reports to the United States on its progress in completing the requirements of the Order. Each such report will provide a complete account of Wells Fargo's actions to comply with each requirement of the Order during the previous 6 months, an objective assessment of the extent to which each quantifiable obligation was met, an explanation of why any particular component fell short of meeting its goal for the previous 6 months, and any recommendations for additional actions to achieve the goals of the Order. Each such report will detail any changes made to the May 2012 Wells Fargo Home Mortgage Retail Pricing Policy and the June 2012 Wholesale Lending Pricing Policy during the previous 6 months. Wells Fargo will submit its first report no later than 180 days after the Effective Date of the Order, and every 180 days thereafter for so long as the Order is in effect. In addition, if applicable, Wells Fargo will attach to the semi-annual reports representative copies of training materials disseminated pursuant to the Order.

## VI. ADMINISTRATION

41.    The Order will terminate 3 months after the submission of Wells Fargo's sixth semi-annual report due under Paragraph 11 to the United States, except that if all the actions required by Paragraphs 17, 29-30, and 37 have not been completed, Paragraphs 17, 29-30, and 37 and this section will continue in effect for an additional 6 months. Notwithstanding the above, the Order may be extended further upon motion of the United States to the Court, for good cause shown.

42.    Any time limits for performance fixed by the Order may be extended by mutual written agreement of the parties. Except as provided by Paragraph 25, other modifications to the Order may be made only upon approval of the Court, upon motion by either party. The parties

recognize that there may be changes in relevant and material factual circumstances during the duration of the Order which may impact the accomplishment of its goals. The parties agree to work cooperatively to discuss and attempt to agree upon any proposed modifications to the Order resulting therefrom.

43.     The Order will be binding on Wells Fargo, including all its officers, employees, agents, assignees, and successors in interest, and all those in active concert or participation with any of them. The Order will consider loans originated by a mortgage joint venture operated by Wells Fargo, which are also underwritten and table-funded by Wells Fargo, to be loans originated by employees of Wells Fargo. In the event Wells Fargo seeks to transfer or assign all or part of its operations, and the successor or assign intends on carrying on the same or similar use, as a condition of sale, Wells Fargo will obtain the written accession of the successor or assign to any obligations remaining under the Order for its remaining term; however, if Wells Fargo terminates its ownership interest in the joint venture and is no longer involved in the ownership or operation of the joint venture, Wells Fargo's joint venture partners are not subject to the terms of this Order for loans originated after the termination of Wells Fargo's ownership interest.

44.     Nothing in the Order will excuse Wells Fargo's compliance with any currently or subsequently effective provision of law or order of a regulator with authority over Wells Fargo that imposes additional obligations on Wells Fargo.

45.     The parties agree that, as of the date of entry of the Order, litigation is not "reasonably foreseeable" concerning the matters described in the Order. To the extent that either party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in the Order, the party is no longer

required to maintain such a litigation hold, with the exception of documents, electronically-stored information, or other things relating to loans originated by Wells Fargo between January 1, 2004, and December 31, 2009.

46.    In the event that any disputes arise about the interpretation of or compliance with the terms of the Order, the parties will endeavor in good faith to resolve any such dispute between themselves before bringing it to this Court for resolution.  If the United States believes that Wells Fargo has violated any provision of the Order, it will provide Wells Fargo written notice thereof and allow 30 days to resolve the alleged violation before presenting the matter to this Court.  In the event of either a failure by Wells Fargo to perform in a timely manner any act required by the Order or an act by Wells Fargo in violation of any provision hereof, the United States may move this Court to impose any remedy authorized by law or equity.

47.    Wells Fargo's compliance with Paragraphs 17, 29-30, and 37 of this Order shall fully and finally resolve all claims by the United States of discrimination, including under the FHA and ECOA, that are raised in the Complaint's allegations of a pattern or practice, in loans originated between January 1, 2004 and December 31, 2009 by the Wells Fargo, of discrimination against African-American and Hispanic borrowers based on racial and national origin disparities in loan pricing and/or product placement, including without limitation all claims for equitable relief and monetary damages and penalties arising from those claims, as well as any claims under any other legal theory based on the same allegations of discriminatory conduct addressed in the Complaint.  The Order does not release claims for practices not addressed in the Complaint's allegations, including claims that may be held or are currently under investigation by any federal agency, or any claims that may be pursued for actions that may be taken by any executive agency established by 12 U.S.C. § 5491 or the appropriate

Federal Banking Agency (FBA), as defined in 12 U.S.C. § 1813(q), against Wells Fargo, any of its affiliated entities, and/or any institution-affiliated party of Wells Fargo, as defined in 12 U.S.C. § 1813(u), pursuant to 12 U.S.C. § 1818 or any other statute or regulation.  The Order does not resolve and release claims other than claims for discrimination.

48.     Each party to the Order will bear its own costs and attorneys' fees associated with this litigation.

49.     The Court will retain jurisdiction for the duration of the Order to enforce the terms of the Order, after which time the case will be dismissed with prejudice.

SO ORDERED, this _21st_ day of _September_ 2012.

_____

UNITED STATES DISTRICT JUDGE

The undersigned hereby apply for and consent to the entry of the Order:

**For Plaintiff United States of America:**

Dated:  July 12, 2012

Respectfully submitted,

ERIC H. HOLDER, JR.
Attorney General

RONALD C. MACHEN JR.
D.C. Bar # 447889
United States Attorney
District of Columbia

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

DANIEL F. VAN HORN
D.C. Bar # 924092
Acting Chief, Civil Division

STEVEN H. ROSENBAUM
D.C. Bar # 417585
Chief
Housing and Civil Enforcement Section
Civil Rights Division

JON M. SEWARD
Deputy Chief

JAVIER M. GUZMAN
D.C. Bar # 462679
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC  20530
Phone:  (202) 616-1761
Fax:  (202) 514-8780
Javier.Guzman2@usdoj.gov

ELIZABETH PARR HECKER
Trial Attorney

HOLLY C. LINCOLN
Trial Attorney

COTY R. MONTAG
D.C. Bar # 498357
Trial Attorney

-27-

Housing and Civil Enforcement Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue NW
Northwestern Building, 7th Floor
Washington, DC 20530
Phone:  (202) 305-0122
Fax:  (202) 514-1116
Coty.Montag@usdoj.gov

For Wells Fargo Bank, NA:

Dated: _July 11_, 2012

Respectfully submitted,

MICHAEL J. HEID
Executive Vice President
Wells Fargo Bank, NA and
President, Wells Fargo Home Mortgage

BART H. WILLIAMS
Munger, Tolles & Olson LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA  90071
Phone (213) 683-9295
Fax:  (213) 687-3702
Bart.Williams@mto.com
Counsel for Wells Fargo Bank, NA

## APPENDIX A

### Release

In consideration for the parties' agreement to the terms of the Consent Order entered in United States v. Wells Fargo Bank, NA, (D.D.C.), and Wells Fargo's payment to me of $_____, pursuant to the Consent Order, I hereby release and forever discharge all claims, accruing prior to the entry of the Consent Order, related to the allegations of housing and credit discrimination in the origination of loans secured by residential real estate at issue in the litigation referenced above, that I may have against Wells Fargo, all related entities, parents, predecessors, successors, subsidiaries, and affiliates, and all of their past and present directors, officers, agents, managers, supervisors, shareholders, and employees and their heirs, executors, administrators, successors, or assigns.

Executed this ____ day of _____, ____.

_____
Signature

_____
Print Name

_____
Address